

**FILED**

JUL 2 3 2021

AT 8:30 4:30 PM
WILLIAM T. WALSH
CLERK

2019R00815/JLH & RA

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Anne E. Thompson |
| | : | |
| v. | : | Crim. No. 21-579 (AET) |
| | : | |
| YITZCHOK "BARRY" | : | Count 1 |
| KURTZER and | : | 18 U.S.C. § 371 |
| ROBIN KURTZER | : | (Conspiracy to Violate the Anti-Kickback |
| | : | Statute) |
| | : | |
| | : | Counts 2 – 4 |
| | : | 42 U.S.C. § 1320a-7b(b)(1)(A) and |
| | : | 18 U.S.C. § 2 |
| | : | (Violations of the Anti-Kickback Statute) |
| | : | |
| | : | Counts 5 – 7 |
| | : | 18 U.S.C. § 220(a)(1) and § 2 |
| | : | (Illegal Remunerations for Referrals to |
| | : | Laboratories) |
| | : | |
| | : | Counts 8 – 10 |
| | : | 18 U.S.C. §§ 1952(a)(1) and (3) and § 2 |
| | : | (Travel Act) |
| | : | |
| | : | Count 11 |
| | : | 18 U.S.C. § 1347 and § 2 |
| | : | (Health Care Fraud) |

# I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark,

charges as follows:

## COUNT 1
### (Conspiracy to Violate the Anti-Kickback Statute)

1.     Unless otherwise indicated, at all times relevant to this Indictment:

### The Defendants and Other Individuals

a.     Defendant YITZCHOK "BARRY" KURTZER ("BARRY KURTZER") resided in Rockland County, New York and practiced medicine in three Pennsylvania offices (collectively, the "Kurtzer Offices"), located in Scranton (the "Scranton Office"), Lake Ariel a/k/a Mount Cobb (the "Lake Ariel Office"), and Greentown (the "Greentown Office").

b.     Defendant ROBIN KURTZER ("ROBIN KURTZER") was BARRY KURTZER's wife, resided in Rockland County, New York, and helped manage the Kurtzer Offices.

c.     Amber Harris ("Harris") and Shanelyn Kennedy ("Kennedy"), each co-conspirators not charged in this Indictment, worked as medical assistants in the Kurtzer Offices.

d.     "Employee-1" resided in Pennsylvania and worked as a physician assistant in the Kurtzer Offices. Employee-1's responsibilities included, among other things, visiting BARRY KURTZER's patients who resided in various nursing homes in and around Scranton, Pennsylvania (the "Nursing Home Patients").

2

e.    "Individual-1" resided in New Jersey and, at various times, worked as a sales representative for "Laboratory-1," located in New Jersey, and "Laboratory-2," located in Pennsylvania.

## The Medicare Program

f.    Medicare was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. Medicare was a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f), and a "health care benefit program" as defined in 18 U.S.C. §§ 24(b) and 220(e)(3). Individuals who received benefits under Medicare were commonly referred to as "beneficiaries."

g.    The Medicare Part B program was a federally funded supplemental insurance program that provided Medicare insurance benefits for individuals aged 65 or older, and for certain individuals who were disabled. The Medicare Part B program paid for various medical services for beneficiaries, including diagnostic genetic tests.

## Genetic Testing

h.    Genetic tests were laboratory tests designed to identify specific inherited mutations in a patient's genes. These genetic variations may affect a patient's risk of developing certain diseases or how the patient responds to medications.

i.    Pharmacogenomic genetic tests related to identifying how a patient's genes affect the patient's response to drugs were commonly referred to as

"PGx" tests. Genetic tests related to a patient's hereditary predisposition for cancer were commonly referred to as "CGx" tests.

> j.      To conduct a genetic test, a laboratory had to obtain a DNA sample from the patient, typically by using a cheek (buccal) swab to collect sufficient cells to provide a genetic profile (the "Genetic Test Swab"). The laboratory then used the Genetic Test Swab to conduct a PGx or CGx test.

> k.      Genetic Test Swabs generally were submitted with a requisition form that typically included information about the patient, the patient's insurance, the swab being submitted, and the referring physician. That physician or another authorized medical professional had to sign the requisition form and confirm on the form that the genetic test was medically necessary.

> l.      If the patient had insurance, such as Medicare, the laboratory typically submitted a claim for reimbursement for the test to the patient's insurance carrier. Reimbursement rates for PGx at times exceeded $1,900 per test, while reimbursement rates for CGx at times exceeded $6,000 per test.

> m.      Laboratory-1 and Laboratory-2 collected Genetic Test Swabs and submitted reimbursement claims to Medicare.

> n.      In most cases, Laboratory-1 and Laboratory-2 did not perform the actual genetic testing onsite. Instead, both typically outsourced the testing to one or more other laboratories, including "Laboratory-3," located in New Jersey.

o.      Individual-1's compensation from each laboratory was based in part on the volume of genetic tests that Individual-1 generated for Laboratory-1 or Laboratory-2 through Individual-1's physician accounts.

### Medicare Rules, Genetic Testing, and Enrollment

p.      Medicare would not cover diagnostic testing, including PGx and CGx testing, that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

q.      To cover diagnostic testing, including PGx and CGx, Medicare required that the "tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a).

r.      On or about October 31, 2018, BARRY KURTZER submitted and caused to be submitted a Medicare Enrollment Application in which he certified that he understood that: the payment of claims was conditioned upon the underlying claims complying with the federal Anti-Kickback Statute;  he would abide by all applicable Medicare laws, regulations, and program instructions; and he would not knowingly present or cause to be presented false or fraudulent claims. On the electronic submission of the same Enrollment Application, ROBIN KURTZER was listed as a contact person and delegated official.

5

## The Conspiracy

2.    From in or about October 2018 to in or about July 2020, in the District of New Jersey and elsewhere, defendants

### YITZCHOK "BARRY" KURTZER and
### ROBIN KURTZER

knowingly and intentionally conspired and agreed with each other, and with Harris, Kennedy, and others to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in exchange for the furnishing and arranging for the furnishing of items and services, namely, the referral of genetic tests, for which payment was made in whole or in part under a Federal health care program, namely Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A).

## Goal of the Conspiracy

3.    The goal of the conspiracy was for BARRY KURTZER, ROBIN KURTZER, and others, to unlawfully enrich themselves by receiving bribes and kickbacks in exchange for collecting Genetic Test Swabs from Medicare patients and steering those samples to Laboratory-1 and Laboratory-2.

## Manner and Means of the Conspiracy

4.    It was part of the conspiracy that:

a.    In or about the fall of 2018, BARRY KURTZER began a business relationship with Individual-1, who was introduced to BARRY KURTZER

6

through another doctor who accepted kickbacks and bribes from Individual-1 in exchange for sending Genetic Test Swabs to Laboratory-1.

b.      Soon after meeting Individual-1, BARRY KURTZER and ROBIN KURTZER agreed with Individual-1 that BARRY KURTZER would steer Genetic Test Swabs for his Medicare patients to Laboratory-1.  In exchange, BARRY KURTZER and ROBIN KURTZER would receive kickbacks and bribes of approximately $2,000 per month from Individual-1.

c.      Consistent with that agreement, BARRY KURTZER, aided by Harris and Kennedy, collected Genetic Test Swabs, primarily for PGx tests, from BARRY KURTZER's Medicare patients and then sent those samples to Laboratory-1 for genetic testing.

d.      BARRY KURTZER accepted monthly cash kickbacks and bribes of approximately $2,000 from Individual-1 at one of the Kurtzer Offices, to which Individual-1 traveled from New Jersey.

e.      BARRY KURTZER and Individual-1 discussed the kickback and bribe payments that Individual-1 was paying another doctor for a similar cash-for-genetic tests scheme, and BARRY KURTZER asked Individual-1 about how the volume of the Genetic Test Swabs he collected compared to the other doctor.

f.      BARRY KURTZER correlated Genetic Test Swab collection to bribe and kickback payments—he instructed his staff to stop collecting Genetic Test

7

Swabs when Individual-1 missed a bribe and kickback payment, and he increased the volume of Genetic Test Swabs when the kickback and bribe payments resumed.

g.     In or about September 2019, after receiving a kickback and bribe payment of approximately $2,000 in cash from Individual-1, BARRY KURTZER and ROBIN KURTZER negotiated an increase to their monthly kickback and bribe payments to a "flat fee" of approximately $3,000 in exchange for steering approximately 30 Genetic Test Swabs to Laboratory-1 each month.

h.     BARRY KURTZER, in ROBIN KURTZER's presence, told Individual-1, in substance and in part, that to get a patient to agree to be swabbed for a genetic test, BARRY KURTZER falsely told the patient, "We have to do these swabs on you. Medicare is going after us. It's a new thing."

i.     BARRY KURTZER and ROBIN KURTZER also solicited and received kickbacks and bribes for other laboratory tests, including allergy tests that BARRY KURTZER and his staff steered to a laboratory affiliated with Laboratory-1. For instance, on or about October 21, 2019, in the Greentown Office, BARRY KURTZER and ROBIN KURTZER accepted a kickback and bribe payment from Individual-1 of approximately $3,800 in cash, reflecting approximately $3,000 for genetic tests and $800 for allergy tests.

j.     Harris and Kennedy also agreed to accept monthly kickback and bribe payments of approximately $250 each in exchange for collecting Genetic Test

Swabs from BARRY KURTZER's Medicare patients and sending those swabs to Laboratory-1 for PGx testing.

k.     Harris and Kennedy subsequently texted Individual-1 about the high volume of Genetic Test Swabs they were generating and asked when they would receive their kickback and bribe payments.

l.     ROBIN KURTZER told Individual-1, in substance and in part, that Harris and Kennedy should not have to be "bribed" to do their work, but ROBIN KURTZER had no trouble "giving them money" as long as they produced results.

m.     BARRY KURTZER and ROBIN KURTZER attempted to conceal from Harris and Kennedy the amount of kickbacks and bribes that BARRY KURTZER and ROBIN KURTZER received from Individual-1.

n.     BARRY KURTZER attempted to conceal from his other employees the true nature of the kickbacks and bribes he received from Individual-1, falsely claiming that they were "rent" payments.

o.     In or about February 2020, BARRY KURTZER, Harris, and Kennedy agreed to start sending Genetic Test Swabs to Laboratory-2, instead of Laboratory-1, because Laboratory-2 collected higher Medicare reimbursements per genetic test, including up to approximately $6,000 for each CGx.

p.     After the onset of the COVID-19 pandemic, BARRY KURTZER and ROBIN KURTZER agreed not to receive kickback and bribe payments in person

and to instead accept those payments by wire and by using a money transfer app via mobile phones (the "App"). Kennedy and Harris also accepted kickback and bribe payments using the App.

q.      As the COVID-19 pandemic continued, BARRY KURTZER, Harris, Kennedy, and others continued to collect and attempted to collect Genetic Test Swabs from Medicare patients.

r.      In or about the same time period, BARRY KURTZER recruited and attempted to recruit Employee-1 to collect Genetic Test Swabs from all of BARRY KURTZER's Medicare Nursing Home Patients, and BARRY KURTZER offered to pay Employee-1 for collecting these swabs.

s.      In total, Medicare was billed over $1,000,000 for genetic tests that BARRY KURTZER and his staff steered to Laboratory-1, and over $70,000 for genetic tests that they steered to Laboratory-2.

## Overt Acts

5.      In furtherance of the conspiracy, and to achieve its illegal objectives, BARRY KURTZER, ROBIN KURTZER, Harris, Kennedy, and others committed, and caused to be committed, the following overt acts in the District of New Jersey and elsewhere:

a.      On or about July 31, 2019, BARRY KURTZER accepted approximately $2,000 in cash from Individual-1, who had traveled from New Jersey to the Lake Ariel Office.

b.      On or about September 12, 2019, BARRY KURTZER and ROBIN KURTZER accepted approximately $2,000 in cash from Individual-1, who had traveled from New Jersey to the Greentown Office.

c.      On or about October 17, 2019, BARRY KURTZER accepted approximately $5,000 in cash from Individual-1, who had traveled from New Jersey to the Scranton Office.

d.      On or about November 21, 2019, BARRY KURTZER and ROBIN KURTZER accepted approximately $3,000 in cash from Individual-1, who had traveled from New Jersey to the Greentown Office.

e.      On or about January 14, 2020, BARRY KURTZER accepted approximately $3,000 in cash and an additional payment of approximately $500 in cash intended for ROBIN KURTZER from Individual-1, who had traveled from New Jersey to the Greentown Office.

f.      On or about January 14, 2020, in the Greentown Office, Harris accepted approximately $500 in cash from Individual-1 to split with Kennedy.

g.      On or about February 20, 2020, BARRY KURTZER accepted approximately $3,000 in cash from Individual-1, who had traveled from New Jersey to the Greentown Office.

h.      Or about March 17, 2020, Harris and Kennedy each accepted approximately $400 via the App from Individual-1, who sent it from New Jersey.

      i.      On or about April 28, 2020, Harris and Kennedy each accepted approximately $300 via the App from Individual-1, who sent it from New Jersey.

      j.      On or about April 28, 2020, BARRY KURTZER and ROBIN KURTZER exchanged texts with Individual-1 to facilitate the payment of kickback and bribe payments from Individual-1 to BARRY KURTZER and ROBIN KURTZER.

      k.      On or about April 29, 2020, BARRY KURTZER and ROBIN KURTZER accepted approximately $2,000 for "March PGx samples" from Individual-1, who sent it from New Jersey via the App to ROBIN KURTZER's App account.

      l.      On or about April 30, 2020, BARRY KURTZER and ROBIN KURTZER accepted approximately $1,000 for "March PGx samples" from Individual-1, who sent it from New Jersey via the App to ROBIN KURTZER's App account.

In violation of Title 18, United States Code, Section 371.

## COUNTS 2 – 4
### (Violations of the Anti-Kickback Statute)

1.      The allegations in paragraphs 1 and 3 to 5 of Count 1 of this Indictment are realleged here.

2.      On or about the dates set forth below, in the District of New Jersey and elsewhere, defendants

### YITZCHOK "BARRY" KURTZER and
### ROBIN KURTZER

did knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in exchange for the furnishing and arranging for the furnishing of items and services, namely, the referral of genetic tests, for which payment was made in whole or in part under a Federal health care program, namely Medicare, as follows:

| Count | Approximate Date of Kickback/Bribe |
|-------|------------------------------------|
| 2     | September 12, 2019                 |
| 3     | November 21, 2019                  |
| 4     | April 29, 2020                     |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

13

<u>COUNTS 5 – 7</u>
**(Illegal Remunerations for Referrals to Laboratories)**

1.      The allegations in paragraphs 1 and 3 to 5 of Count 1 of this Indictment are realleged here.

2.      On or about the dates set forth below, in the District of New Jersey and elsewhere, defendants

**YITZCHOK "BARRY" KURTZER and
ROBIN KURTZER**

did knowingly and willfully solicit and receive any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring a patient and patronage to a laboratory with respect to the referral of genetic tests covered by a health care benefit program, in and affecting interstate commerce, as follows:

| Count | Approximate Date of Kickback/Bribe |
|-------|-------------------------------------|
| 5 | September 12, 2019 |
| 6 | November 21, 2019 |
| 7 | April 29, 2020 |

In violation of Title 18, United States Code, Section 220(a)(1) and Section 2.

## COUNTS 8 – 10
### (Travel Act)

1.      The allegations in paragraphs 1 and 3 to 5 of Count 1 of this Indictment are realleged here.

2.      On or about the dates set forth below, in the District of New Jersey and elsewhere, defendants

### YITZCHOK "BARRY" KURTZER and
### ROBIN KURTZER

did knowingly and intentionally travel in and use facilities in interstate commerce and cause the travel in and use of facilities in interstate commerce with the intent to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of an unlawful activity, that is, commercial bribery contrary to N.J.S.A. § 2C:21-10, and, thereafter, did perform and attempt to perform an act to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of such unlawful activity as follows:

| Count | Approximate Date | Travel or Use of Facility in Interstate Commerce | Subsequent Act |
|---|---|---|---|
| 8 | September 12, 2019 | Individual-1 traveled from New Jersey to the Greentown Office to provide a $2,000 cash payment to BARRY KURTZER and ROBIN KURTZER. | BARRY KURTZER and ROBIN KURTZER accepted a $2,000 cash payment from Individual-1. |
| 9 | November 21, 2019 | Individual-1 traveled from New Jersey to the Greentown Office to provide a $3,000 cash payment to BARRY KURTZER and ROBIN KURTZER. | BARRY KURTZER and ROBIN KURTZER accepted a $3,000 cash payment from Individual-1. |
| 10 | January 14, 2020 | Individual-1 traveled from New Jersey to the Greentown Office to provide a $3,500 cash payment to BARRY KURTZER and ROBIN KURTZER. | BARRY KURTZER accepted a $3,500 cash payment from Individual-1 on behalf of himself and ROBIN KURTZER. |

In violation of Title 18, United States Code, Section 1952(a)(1) and (3) and Section 2.

## COUNT 11
### (Scheme to Commit Health Care Fraud)

1.      The allegations in paragraphs 1, 4, and 5 of Count 1 of this Indictment are realleged here.

2.      From in or about October 2018 to in or about July 2020, in the District of New Jersey, and elsewhere, defendant

### YITZCHOK "BARRY" KURTZER

with others, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud a health care benefit program, namely Medicare, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by, or under the custody or control of, any health care benefit program, namely Medicare, in connection with the delivery of or payment for health care benefits, items or services.

3.      It was the goal of the scheme for BARRY KURTZER, with others, to unlawfully enrich himself by submitting and causing the submission of false and fraudulent claims to Medicare for items and services that were ordered or provided through illegal kickbacks and bribes, and submitting and causing the submission of false and fraudulent claims to Medicare for services that were medically unnecessary and ineligible for reimbursement.

4.      In was part of the scheme that BARRY KURTZER, with others:

       a.      accepted kickbacks and bribes for collecting Genetic Test Swabs from Medicare patients, regardless of whether the testing was medically necessary;

       b.      agreed to collect certain monthly quotas of Genetic Test Swabs from Medicare patients for genetic testing, regardless of whether the testing was medically necessary;

       c.      induced patients to provide Genetic Test Swabs for genetic testing, regardless of whether the testing was medically necessary;

       d.      caused staff at the Kurtzer Offices to flag new Medicare patients to be swabbed for genetic tests, regardless of whether the testing was medically necessary;

       e.      attempted and planned to collect Genetic Test Swabs from BARRY KURTZER's Nursing Home Patients for genetic testing, regardless of whether the testing was medically necessary;

       f.      failed to review or otherwise use the results of the genetic tests, unless a patient actively requested such results;

       g.      caused genetic test requisition forms to be submitted to Laboratory-1 and Laboratory-2 that falsely and fraudulently attested to the medical necessity of those genetic tests; and

       h.      solicited and received kickbacks and bribes for other laboratory tests, including allergy tests, regardless of medical necessity.

In violation of Title 18, United States Code, Section 1347 and Section 2.

18

## FORFEITURE ALLEGATION

### Counts 1 – 4 and 11

1.      Upon conviction of the Federal health care offenses (as defined in 18 U.S.C. § 24) alleged in Counts 1 to 4 and 11 of this Indictment, the defendants charged in each respective count shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real or personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offenses (as defined in 18 U.S.C. § 24) alleged in Counts 1 through 4 and 11.

### Counts 8 – 10

2.      Upon conviction of the offenses alleged in Counts 8 – 10 of this Indictment, the defendants charged in each respective count shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, any and all property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of such offense.

### SUBSTITUTE ASSETS PROVISION

3.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be

divided without difficulty;

the United States shall be entitled, pursuant to 21 U.S.C. § 853(p) (as incorporated by

28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)), to forfeiture of any other property of the

defendant up to the value of the above-described forfeitable property.

A TRUE BILL

_____

RACHAEL A. HONIG
Acting United States Attorney

CASE NUMBER: **21-579 (AET)**

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

**v.**

## YITZCHOK "BARRY" KURTZER and
## ROBIN KURTZER

# INDICTMENT FOR

**18 U.S.C. § 371**
**42 U.S.C. § 1320a-7b(b)(1)(A), 18 U.S.C. § 2**
**18 U.S.C. § 220(a)(1) and § 2**
**18 U.S.C. §§ 1952(a)(1) and (3) and § 2**
**18 U.S.C. § 1347 and § 2**

RACHAEL A. HONIG
ACTING UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

JOSHUA L. HABER
RAHUL AGARWAL
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY
973-645-3978